**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FELICIA KELSO )<br>305 Aqua Lynn Drive )<br>Fort Washington, MD 20744 )<br>  )<br>  Plaintiff, )<br>  )<br>  v. )<br>  )<br>SONNY PERDUE, Secretary, )<br>U.S. DEPARTMENT OF )<br>AGRICULTURE, )<br>1400 Independence Avenue, SW )<br>Washington, DC 20250 )<br>  )<br>  Defendant. )<br>  ) | Civil Action No.<br><br>Jury Trial Demanded |

## COMPLAINT

Felicia Kelso ("Plaintiff"), by and through his undersigned counsel, complains of the Department of Veterans Affairs ("Defendant" or "Agency") as follows:

## PARTIES

1. Plaintiff is a resident of Fort Washington, Maryland.

2. On information and belief, Sonny Perdue, Secretary for the Department of Agriculture, is named in his official capacity as the Defendant that formerly employed Plaintiff.

## JURISDICTION AND VENUE

3. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 *et seq.* ("Rehab Act"), and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* ("ADEA").

1

4. Venue is proper in this judicial district because Defendant is located here and because the unlawful employment practices giving rise to this action were committed and occurred in this District.

5. Plaintiff has exhausted her administrative remedies by timely filing this lawsuit within 90-days of October 2, 2019, the date Plaintiff received the Office of Federal Operations of the U.S. Equal Employment Opportunity Commission ("EEOC") decision dated September 30, 2019.

## STATEMENT OF FACTS

*Background Information.*

6. On or about March 10, 2013, Defendant hired Plaintiff as a 30% disabled compensable veteran where she was employed as an Executive Assistant/Staff Assistant.

7. From approximately March 2013 to May 2014, Mary Beth Lepore, Director for Human Resources Management, was Plaintiff's first-line supervisor and after May 2014, Lepore was Plaintiff's second-line supervisor.

8. From approximately December 2014 through the relevant time period, Mario Troncoso, was Plaintiff's first-line supervisor.

9. Randall Murbach was the Disability Program Manager and his job duties were to process reasonable accommodation requests.

*Plaintiff's Protected Classes:*

10. Plaintiff identifies as a black/African-American female and she was over 40 years of age at all times relevant in the complaint.

11. Plaintiff suffers from Post-traumatic Stress Disorder ("PTSD"), depression, anxiety, and chronic migraine headaches which are disabilities that substantially limit her major life activities of concentration, thinking, sleeping, and communication/interaction.

12. Plaintiff also suffers from lumbar strain which is a disability that substantially limits her major life activities of sitting, walking, standing, lifting, bending, twisting, stooping, pushing, pulling, squatting, kneeling, and climbing.

13. On May 15, 2014, Plaintiff initiated EEO contact; August 25, 2013 she filed her formal complaint; on November 24, 2014, Plaintiff participated in a mediation of her EEO complaint; and Plaintiff requested reasonable accommodations and reported discrimination, harassment, and retaliation throughout December 2014 through the end of the relevant time period.

14. Plaintiff's supervisors (Lepore and Troncoso) were aware of Plaintiff's protected classes, her requests for reasonable accommodations, and EEO activity.

15. Murbach testified that Plaintiff requested reasonable accommodations based on two disabilities (PTSD and a musculoskeletal disability) and that "she has a qualified disability, no question about it..."

*Plaintiff's Schedule and Job Performance:*

16. In 2013, all Executive/Staff Assistants were on a Maxiflex schedule except Plaintiff, who was on a 4/10s schedule (four 10-hour days).

17. In 2014, all Executive/Staff Assistants including Plaintiff were on a Maxiflex schedule.

18. Plaintiff's job performance was at all times successful and the only performance rating Plaintiff received was for the appraisal period March 10, 2013 to September 30, 2013 which was "Fully Successful."

19. Plaintiff was at all times able to perform the essential functions of her job with reasonable accommodations (flexible schedule and telework), as she had previously worked under a Maxiflex schedule with telework options without issue.

*Plaintiff's Job Duties:*

3

20. Plaintiff's Position Description ("PD") dated October 22, 2014 identified her major duties of her job position as follows:

- Incumbent is the technical and administrative advisor to the HRM Director and staff for all matters relating to policies, personal philosophy, views and objectives as well as the goals and matters…

- Assists in development of written administrative policies and procedures…

- Works with the supervisor and top management of the unit, develops concise methods of communication, utilizing the latest communication technology, telephone briefings, power points, slides, projectors, and multiple source data…

- Collects and analyzes pertinent logistical data and information…

- Manages supervisor's calendar and itinerary…reschedules and redirects requests for the supervisor when conflicts arise…uses office automation systems and various software packages to accomplish work. Assignments include text editing, file creation, maintenance, and retrieval; use of message, calendar and suspense systems; and use of other specialized tools in support of specific functions.

21. Troncoso testified that Plaintiff would be the "frontline greeter" for guests scheduled to meet with Lepore in the Washington DC office which required Plaintiff to wait at the door for the guest, greet the guest, accompany the guest to the conference room – and Lepore was present in the DC office approximately 50% of the time.

22. Plaintiff could perform the essential job duties of her position with reasonable accommodations (telework) because most of the duties could be performed remotely.

*Similarly-situated coworkers:*

23. During the relevant time, there were three other similarly-situated Executive Assistants to Plaintiff: Fernando Sanchez and Ginger Anderson located in the Albuquerque office; and Nicole Lovering located in the Washington, D.C. office.

24. None of the other Executive Assistants were black/African-American, disabled, or engaged in prior protected activities, and Lovering was under 40 years of age.[1]

*Plaintiff's January 8, 2014 Injury and Leave:*

25. On January 8, 2014, Plaintiff suffered a back injury while she was packing and moving heavy boxes with reference materials, files, and books to complete the office relocation to the Yates Building.

26. On January 15, 2014, Plaintiff filed a workers' compensation claim on January 31, 2014, she submitted medical documentation from her physician Zakiya Steadman, M.D. that identified Plaintiff's injuries and requested an evaluation by a physical therapist to determine Plaintiff's return to work date and medical restrictions. Plaintiff was on medical leave until March 31, 2014.

*Lepore Changes Plaintiff's Schedule:*

27. On February 18, 2014, Lepore instructed Plaintiff that when she returned to work, her schedule would be 8-hours/5-days per week because four 10-hour days does not meet the office needs.

28. Prior to Plaintiff's injury and medical leave, her work schedule had been a 4/10s and later a Maxiflex schedule with a tour of duty from 6:00am – 3:30pm.

*Plaintiff Requests Reasonable Accommodations that are Denied:*

29. On March 10, 2014, Dr. Steadman submitted a letter stating that Plaintiff should remain out from work until March 24, 2014 and requested reasonable accommodations (light duty telework for 4-hours per day) upon Plaintiff's return until April 7, 2014.

---

[1] Lovering was hired under Special Hiring Authorities for Veterans with greater 30% disability but she had not requested any reasonable accommodations.

30. On March 19, 2014, Plaintiff emailed a request for reasonable accommodations (tour of duty changed from an 8-hour schedule to her previous schedule that she had prior to her injury (8 nine-hour day/1 eight-hour day/CWS one day).

31. Rhonda Flores, Deputy Director, replied denying Plaintiff's requests for reasonable accommodations stating that Plaintiff's doctor cannot direct telework and her position cannot support a compressed work schedule.

32. This was not true because Plaintiff's prior schedule had permitted telework and variable schedule.

33. On March 28, 2014, Dr. Steadman submitted an Attending Physician's Report that identified that Plaintiff was unable to sit, stand, or walk for prolonged periods of time and requested reasonable accommodations (telework for 4-hours per day from March 31, 2014 to likely increase on May 31, 2014).

34. On March 31, 2014, the day Plaintiff returned to work, management immediately threatened her that she would be charged AWOL if she did not submit acceptable documentation by April 7, 2014 because Plaintiff's medical documentation only excused her to March 24, 2014.

35. Plaintiff was already overwhelmed by hostility upon her return but she managed to submit the requested documentation by the deadline.

36. On April 1, 2014, Plaintiff emailed Mark Green, Assistant Director of Employee Relations Green and Lori Edgecombe and requested her schedule hours to be 7:15 – 11:15.

37. On April 3, 2014, Plaintiff emailed Green and Edgecombe and requested reasonable accommodations (flexibility in arrival time) and asked for clarification because she had been on a Maxiflex schedule since she was hired and there were a lot of changes since her injury that she did not understand.

*April 3, 2014 – Lepore Issues Plaintiff a Letter of Instruction:*

38. Less than a week after Plaintiff's return to work from medical leave, on April 7, 2014, Green issued Plaintiff a Letter of Instruction ("LOI") dated April 3, 2014 from Lepore that stated Plaintiff must adhere to normal leave procedures by submitting a request for approval in advance to Lepore or Green/Edgecombe in Lepore's absence and within a reasonable time upon return to duty in any emergency or unplanned situations requiring sick leave.

39. The LOI also denied Plaintiff's requested reasonable accommodations stating that Plaintiff's doctor cannot direct telework and directed Plaintiff to provide medical documentation without the telework restriction.

40. Lepore testified that a LOI is issued when there has been a "pattern of behavior that shows the employee is not following the verbal instructions that they've been given" and she issued Plaintiff the LOI because Lepore allegedly verbally instructed Plaintiff to contact one of the assistant directors (Green or Edgecombe) if Lepore was unavailable to request leave.

41. Lepore had never raised any issues or verbally counseled Plaintiff about leave concerns and prior to Plaintiff's medical leave, she requested leave from Lepore without issue and Lepore signed off on all of Plaintiff's time and attendance reports as her first-line supervisor.

*Plaintiff Requests Reasonable Accommodations that are Denied:*

42. On April 9, 2014, Green emailed Plaintiff and stated that her request for a 7:15-11:15 tour of duty was denied but Lepore agreed to a start time between 8-9am.

43. On April 28, 2014, Plaintiff submitted a request for leave from May 12, 2014 to May 14, 2014 for a total of 12 hours, since she was working 4 hours days, for a "stress break."

44. On May 7, 2014, Lepore denied Plaintiff's request for leave stating that she would be traveling that week and that other employees including Lepore must cover Plaintiff's duties while she is out of the office.

45. Plaintiff was genuinely sick on those days so on May 12 and 13, 2014, Plaintiff called the office to call out sick and spoke with Mika Perrin, Administrative Support Assistant who answered the phone and Perrin told Lepore and Edgecombe that Plaintiff was sick and would not be in the office.

46. Plaintiff was unable to contact her supervisors directly because they were not in the Washington Office and she was having connectivity issues that morning with email.

*Lepore Charges Plaintiff Absent Without Leave:*

47. According to Lepore, she charged Plaintiff with AWOL because Plaintiff failed to follow procedures since she did not call Lepore to call out sick and she did not have any leave because Plaintiff's advance request for leave was denied.

48. This was not true because Plaintiff's illness was an emergency and the manner she called off from work was acceptable per Lepore's instructions.

49. Lepore's AWOL charges were in excess since Plaintiff was only working 4-hour days totaling 8 hours instead of 16 hours.

50. Plaintiff provided clinical notes from her visit to the medical center the following day, May 14, 2014 that showed she was still unwell.

51. Perrin testified that it was accepted for employees to call-in and ask another employee to connect with their supervisor on that employee's behalf to request leave.

52. Plaintiff was the only employee Lepore charged with AWOL from 2013 through the relevant time period.

*May 19, 2014 – Lepore issued Plaintiff a Letter of Reprimand:*

53. On May 19, 2014, Lepore issued Plaintiff a Letter of Reprimand ("LOR") based on allegations that Plaintiff had failed to complete "some" work assignments by failing to maintain performance folders and failing to complete her performance plan.

8

54. The allegations were false: on December 5, 2013, Lepore directed Plaintiff to work with a colleague to set up 2014 performance forms for her direct reports to be completed by December 10, 2013 which Plaintiff promptly completed by December 6, 2013; and on December 23, 2013, Lepore explained to Plaintiff that they would meet later to finalize her performance plan after Lepore provided Plaintiff with her performance objectives, which Lepore did not send to Plaintiff until January 5, 2015, which Plaintiff finalized that day.

55. Lepore never told Plaintiff to maintain performance folders and Plaintiff never failed to finalize her 2014 performance plan and Lepore's delay in addressing her alleged concerns

56. Plaintiff was the only employee Lepore issued a LOR to from 2013 through the relevant time period.

*Lepore Hires Plaintiff's Replacement and Plaintiff Requests Reasonable Accommodations:*

57. From approximately May 21, 2014 through November 30, 2014, Plaintiff was out on leave from work.

58. In or around November 2014, Lepore hired Nicole Lovering (white, 30's, no claimed disability/no known prior EEO activity) because there was a need for a full-time administrative assistant since Plaintiff had been out on extended medical leave from June 2014 to December 2014.

59. Plaintiff was instructed to report to Troncoso (Albuquerque office) upon her return and prior to Plaintiff's return and continuing until she left on medical leave in January 2015, Plaintiff requested reasonable accommodations from Troncoso which he repeatedly denied.

60. On November 24, 2014, Plaintiff emailed Troncoso requesting reasonable accommodations (5/4/9 Maxiflex schedule with a tour of duty from 6:00am – 3:30pm as it was prior to her injury) which Troncoso denied stating that Plaintiff's schedule must mimic Lepore's schedule.

61. Murbach testified that in early 2015 when Plaintiff requested reasonable accommodations, he had reached out to Troncoso and Troncoso "immediately made a decision on the accommodation right off the bat" and "immediately responded" that he had already denied Plaintiff's requests, which Murbach found unusual because supervisors usually do not make a decision until after Murbach submits his recommendation.

62. On or about December 4, 2014, Plaintiff returned to work on a part-time schedule, light-duty position through workers' compensation that permitted telework Tuesdays/Thursdays and she resumed full-time duty in mid-December 2014.

63. From the time Plaintiff returned in December 2014 through January 30, 2015, Lepore said no more than 30 words to Plaintiff and avoided interactions with her even though Plaintiff's desk was located in front of Lepore's desk and she would come in direct contact with her when Lepore was present in the office.

64. Lepore ignored Plaintiff's greetings such as "good morning" and would not respond making Plaintiff feel ostracized, disliked, stressed, and anxious.

*Plaintiff's Job Duties are Removed:*

65. Lepore removed Plaintiff's job duties of managing Lepore's schedule and travel because it was "very important that there be consistency and someone daily, routinely handling the most critical duties" and reassigned Plaintiff's job duties for her calendar and travel to Sanchez.

66. Plaintiff could have continued to perform these job duties and they could be performed remotely.

67. On or about December 4, 2014, Plaintiff met with Green where he informed her that Lovering would now be responsible for Lepore's calendar, travel and she would be the lead

administrator point of contact for Human Resources in the Washington Office, in addition to Troncoso would be sending a new performance plan and assignments.

68. Plaintiff had also been removed from the executive team PDL (email listing) and was not placed back on the list until January 9, 2015.

69. Plaintiff's job duties were reduced to making copies, dropping off packets for signatures, and Lovering directed her to research a menu for the Leadership Retreat.

70. The harassment was severe and pervasive to the point that Plaintiff had to take leave from December 5-12, 2014.

71. On December 12, 2014, Plaintiff emailed Troncoso a request for FMLA which he read that day.

72. On December 15, 2014, Troncoso messaged Plaintiff and told her that there were no tasks she could do in telework the next day (her light duty position permitted telework Tuesdays/Thursdays) but Plaintiff explained that she already had a medical appointment scheduled the following day.

73. Troncoso responded to Plaintiff, "Sorry to have to ask, is this medical apt for your work injury?"

74. Plaintiff asked, "does it matter?" to which Troncoso stated that it does matter if it is related to a work injury.

75. Troncoso then proceeded with more invasive questions: if Plaintiff was going to have a medical appointment every Tuesday; if Plaintiff had a medical update from her last visit; what changes, if any were there from Plaintiff's doctor to her work conditions.

76. Troncoso's interrogation made Plaintiff very uncomfortable.

77. On or about December 15, 2014, Plaintiff emailed Troncoso a list of her appointments per his request where one included a meeting with her attorney and Plaintiff requested "official time."

78. On December 18, 2014, Plaintiff requested that tasks be established the Friday of the week before or on Monday at the start of the week so expectations would be clear.

79. On December 19, 2014, Troncoso replied harshly and demanded to know why Plaintiff's meeting/consulting with an attorney should be official time and asked Plaintiff if it was related to the settlement agreement or did she need to speak with an attorney for any EEO case.

80. Plaintiff felt intimidated and compelled to disclose that the meeting was related to settlement.

81. On December 22, 2014, Plaintiff submitted a request to Troncoso for 80 hours of advanced sick leave for rehabilitation and recovery medical treatment but he never responded.

82. On December 27, 2014, Plaintiff was rushed to hospital and admitted for severe migraine due to ongoing stress and harassment at work.

83. On December 29, 2014, Plaintiff emailed Troncoso and told him that she was having a bad migraine and throwing up and would not be in the office that day. Troncoso emailed Plaintiff that he needed to remind her of the call-in procedures which she understood was meant to intimidate her.

84. In addition, Troncoso's directives were confusing because Troncoso told Plaintiff to send a list of appointments but then he would become angry when she took time off from work even though he knew about those appointments or he would tell Plaintiff to call numbers and then he would not answer.

85. On January 6, 2015, Troncoso instructed Plaintiff to check in with Lovering to see if she could assist her with any of Lepore's travel, meetings, correspondence.

86. Plaintiff asked Troncoso why she was not the primary and Troncoso explained that Lovering was hired to cover those duties and he would work with Plaintiff so she could eventually assume primary ownership of those duties.

87. Those reasons were not credible since Plaintiff had significantly more experience than Lovering and Plaintiff had already been the primary successfully covering those duties prior to Lovering being hired.

88. Defendant hired Lovering who was younger and less experienced than Plaintiff to replace her – after Plaintiff had returned to work full-time, the Executive Staff Organization Chart dated January 21, 2015 identified only Lovering and Plaintiff was not included.

*Troncoso delays and denies Plaintiff's request for advanced leave:*

89. On January 12, 2015, Plaintiff re-sent her December 22, 2014 request for 80 hours of advanced sick leave for rehabilitation and recovery medical treatment to Troncoso since he still had not replied.

90. Troncoso replied that he just found Plaintiff's request for advanced sick leave and he would move it along but advanced sick leave may not be used for "minor illnesses" such as a cold or the flu.

91. Troncoso's remarks demonstrated his animus towards Plaintiff's disability and were unwarranted since Plaintiff was not requesting advanced sick leave for a "cold" or "flu."

92. Troncoso's failure to process Plaintiff's request for leave resulted in her taking leave without pay.

93. Troncoso did not recommend approval for Plaintiff's advanced sick leave request because of her alleged "pattern of absence and her inability to earn leave and…accrue any leave" but he also did not know if employees were required to have accrued leave to be eligible to receive advance sick leave.

94. In fact, up to 240 hours of sick leave may be advanced regardless of the annual leave balance.

*Plaintiff is subjected to ongoing harassment:*

95. On or about January 12, 2015, Troncoso asked Plaintiff a question during a meeting with all of the Executive Staff but mocked her response in a belittling manner.

96. Shortly after the meeting, Troncoso accused Plaintiff of exhibiting "checked out" body language which Plaintiff interpreted as a comment about her depression and PTSD.

97. On January 13, 2015, Plaintiff asked Troncoso where her FMLA form was that she submitted on December 12, 2014.

98. On January 13, 2015, Troncoso denied receiving Plaintiff's request for FMLA which she had already received a read-receipt.

99. On January 14, 2015, Plaintiff emailed Troncoso and explained that her morning appointment was cancelled due to inclement weather and she notified him of unscheduled telework starting at 6:45am but she would be off line at 2:00pm for an appointment.

100. Troncoso replied that "this is what I am talking about when I ask for your schedule or when I can expect you at work" but Plaintiff had already provided Troncoso with the information he requested.

101. Neither Troncoso nor Lepore treated any other staff with the same animosity, distrustful questions, or requirements.

*Plaintiff's Requests for Unscheduled Telework due to Inclement Weather:*

102. Plaintiff requested unscheduled telework due to inclement weather several times that Troncoso denied resulting in her using leave hours unnecessarily while liberally approving Lovering's requests.

January 14, 2015.

103. On January 14, 2015, Plaintiff emailed Lepore and Troncoso and requested unscheduled telework but stated she could go into the office if needed.

104. More than 4-hours later, Troncoso replied that he did not approve Plaintiff to telework.

105. Plaintiff replied that her unscheduled telework request was due to inclement weather.

106. On January 14, 2015, Lepore and Troncoso approved Lovering for 8 hours unscheduled telework without any issues.

January 26, 2015.

107. On January 26, 2015, Plaintiff messaged Troncoso and requested unscheduled telework, which was due to inclement weather.

108. Troncoso replied that he needed to know what Plaintiff's plans were and telework due to weather is approved only when there are tasks that can be accomplished in a telework environment.

109. Plaintiff replied seeking clarification because she had her duties removed and was acting as a "back-up" and asked if Troncoso wanted her to take leave or come into the office.

110. On January 26, 2015, Lovering was approved for 4 hours telework without any issues.

January 27, 2015.

111. On January 27, 2015, Plaintiff messaged Troncoso and advised that she would telework that day and included the policy where employees with a telework agreement in place may participate in unscheduled telework as indicated by OPM without supervisory approval but must inform their supervisors of their intent.

112. Troncoso replied that Plaintiff did not have an ad hoc telework agreement and he would consider approving her request once he received the tasks completed.

113. Plaintiff replied that she had worked 5 hours including a 2-hour delay and she had provided him with the ad hoc agreement on January 8, 2015 and his behavior was harassment, retaliation.

114. On February 9, 2015, Troncoso declined Plaintiff's requests to telework on January 26 and 27, 2015.

115. Lovering was permitted to telework on January 6, 14, 26, 2015; February 4 and 26, 2015; March 5, 2015; April 3, 2015 – and she was permitted to flex on March 20, 2015 without issue.

116. Lovering's requests for telework were granted with ease and Troncoso and Lepore suggested that Lovering telework, i.e. she could "get more done while in telework," and "do you want to telework tomorrow to be safe?"

117. Lepore and Troncoso treated Lovering who is outside of Plaintiff's protected classes much more favorably than Plaintiff for no legitimate reason.

*Belittling Emails Sent to All Staff:*

118. On January 21, 2015, Lepore belittled Plaintiff in an email cc'ing Lovering, Sophia Chapman, Pamela Spearow, Troncoso, and Anderson directly criticizing only Plaintiff stating, "this doesn't make sense" and "this is not helpful."

119. Plaintiff had not done anything wrong and was humiliated by Lepore's email and Anderson (one of the recipients of the email) acknowledged that Lepore unfairly singled Plaintiff out in the email.

120. On January 28, 2015, Lepore emailed Plaintiff and cc'd Troncoso alleging she had poor job performance and behavior, Lepore had observed Plaintiff appeared "discontent and sullen" which made her colleagues feel uncomfortable, Lepore was concerned about Plaintiff's

attendance, and Plaintiff was expected to be in the office to receive and deliver documents, provide administrative assistance and support…in a "pleasant responsive manner."

*Plaintiff forced to go out on leave:*

121. On February 2, 2015, Plaintiff went out on leave due to exacerbation of her PTSD, anxiety, depression caused by Defendant's ongoing discriminatory and retaliatory harassment.

122. Defendant's actions of changing Plaintiff's schedule, repeated denials of her requests for reasonable accommodations, removal of job duties, write-ups, and hostility significantly altered Plaintiff's work conditions and interfered with her ability to perform her job.

123. Defendant's stated reasons for denying Plaintiff's requests for reasonable accommodations (telework) because the position cannot support telework are not true because Lepore's former Executive Assistant, Mary Jane Bergener, had a Core Telework Agreement where she was permitted to telework Thursdays approved by Lepore in January 2013 and Plaintiff previously teleworked without issue.

124. Defendant's stated reasons for issuing the LOI, LOR, charging Plaintiff with AWOL, denying her requests for unscheduled telework, and the regular occurring incidents above-mentioned are equally untrue and Plaintiff was the only employee who received those disciplinary actions.

125. Michelle Mallory, Human Relations Specialist, testified that the staff in the Albuquerque office have stereotypes and "do not like DC people who are black," and Albuquerque staff "had it in for [Plaintiff]."

## COUNT 1

126. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

127. By and through its conduct, Defendant subjected Plaintiff to unlawful discrimination based on her race in violation of Title VII of the Civil Rights Act of 1964.

128. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, lost wages, and her losses are continuing.

## COUNT 2

129. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

130. By and through their conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.

131. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, lost wages, and her losses are continuing.

## COUNT 3

132. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

133. By and through their conduct, Defendant subjected Plaintiff to unlawful retaliatory hostile work environment in violation of Title VII of the Civil Rights Act of 1964.

134. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, lost wages, and her losses are continuing.

## COUNT 4

135. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

136. Defendant discriminated against Plaintiff because of her disabilities when it failed to accommodate her and treated similarly-situated coworkers without disabilities more favorably in violation of Section 501 of the Rehabilitation Act of 1973.

137. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, lost wages, and her losses are continuing.

## COUNT 5

138. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

139. By and through its conduct, Defendant subjected Plaintiff to an unlawful hostile work environment because of her disabilities in violation of Section 501 of the Rehabilitation Act of 1973.

140. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, lost wages, and her losses are continuing.

COUNT 6

141. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

142. By and through their conduct, Defendant subjected Plaintiff to unlawful retaliation for requesting reasonable accommodations in violation of Section 501 of the Rehabilitation Act of 1973.

143. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, lost wages, and her losses are continuing.

COUNT 7

144. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

145. Defendant discriminated against Plaintiff because of her age when it hired a younger less experienced individual to replace Plaintiff in violation of the Age Discrimination in Employment Act of 1967.

146. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, lost wages, and her losses are continuing.

<b>JURY DEMAND</b>

Plaintiff demands a trial by jury on all counts contained in the Complaint.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment against the Defendant on all Counts and award Plaintiff lost wages and benefits, compensatory damages in the amount of $300,000, or in an amount to be determined at trial, for pain and suffering and

emotional distress, pre- and post-judgment interest, costs, attorneys' fees, and any such other relief as is just and proper.

Date:   December 31, 2019                                         RESPECTFULLY SUBMITTED,

                                                                  Alan Lescht & Associates, P.C.

                                                                  By: /s/_____
                                                                  Rani Rolston [Bar # 974052]
                                                                  ALAN LESCHT & ASSOCIATES, P.C.
                                                                  1825 K Street, N.W., Suite 750
                                                                  Washington, D.C. 20006
                                                                  Tel: (202) 463-6036
                                                                  Fax: (202) 463-6067
                                                                  rani.rolston@leschtlaw.com
                                                                  *Attorney for Plaintiff*